May it please the court. Good morning, your honors. My name is Judith Saki and I come before this court on behalf of the appellant Erica Brown with respect to her appeal. Ms. Brown respectfully asks this court to reverse the decision of the district court below on the basis of sufficiency or insufficiency of the evidence as per her Rule 29 motion. While the consolidated brief filed by the appellant in this case does speak to a number of issues, my argument will be limited solely to the government's failure to prove the second element of the substantive counts mail fraud and on the record below. Ms. Brown was initially a customer, later turned employee of this Rent to Own a Vehicle program operated and advertised by Mr. Williams under his various business models. She worked under the general framework of an already existing business and the services that it offered. Ms. Brown does not deny that she posted advertisements on the Craigslist and through the Penny Saver ads and she certainly doesn't deny marketing and promoting the business to family, friends, based on her own satisfaction as a customer of the program. However, to say that she did so knowingly, participating in this scheme to defraud, your honors, with specific intent to do so, plainly goes against the weight of the evidence in this case. You don't deny there was a scheme to defraud do you? Your Honor, I do not. I do not deny that. However, I do not deny that she joined in that. That is correct and per the record below, I certainly believe that it goes against the weight of the evidence in light of the fact that she was actually acquitted of the conspiracy count charged in the indictment. This fact certainly goes a long way. It goes to show that the evidence produced at trial was deficient. Deficient with respect to showing that she intended to defraud persons of their monies or that she knowingly participated in any scheme or even aided and abetted in that particular scheme. If the jury was in fact able to find that Ms. Brown did not in fact conspire with Mr. Williams, which is said to be one of the easier crimes to prove, then the question then becomes what exactly is it that she did? She posted ads, yes, certainly, but we submit to the court that the government falls short here with respect to the requisite intent required with respect to those of Mr. Williams to come in, the jury would not have been able to connote that she then maintained some level of insight or insider information as to how the business was said to operate. And simply because of this short-lived intimacy, the jury, I believe, was influenced by it. The fact of the matter, Your Honors, is that our position is that there was no evidence to show that Ms. Brown at any time acted with any fraudulent intent to defraud or deprive persons of their monies. In fact, as a participating customer initially of the program, again, as I related to the court, she suggested to friends and families and acted in good faith making representations concerning the marketing of the program and how it was expected to run. She, along with many other of the witnesses who testified, who were also members and customers of the program, understood that there was a component of the program whereby as a member, you would market and advertise, you know, the opportunity to rehabilitate one's credit, rebuild your credit, ultimately obtain a secured credit card, so on and so forth. This is essentially the argument that was made to the jury and the jury rejected. To some extent, Your Honor, but the jury was, in fact, I believe, clouded, again, by the instruction or, I'm sorry, the evidence that was able to come in with respect to her relationship with Mr. Williams. But the fact that she, again, was acquitted of the conspiracy, we think, flies in the face of the charges she now stands convicted on. But you're not suggesting that the fact that she was acquitted of the conspiracy charge speaks to the substantive count? No, Your Honor, I'm not suggesting that. However, as it relates to this case, it is our position that the evidence is insufficient to show that she acted with the specific intent to defraud persons or that she knowingly participated in this scheme to defraud. Any of the representations that she made were certainly made in good faith and not with the intention to deceive. And so, Your Honor, we'd ask that the Court reverse and remand the decision below with findings. Thank you, Your Honors. Thank you. I'll probably get this wrong. Mr. Iwanagi? Iwanagi. Iwanagi? Iwanagi, Your Honor. Iwanagi, all right. You're pretty close. Good morning. Good morning, Judge Gregory. Good morning, Judge Duncan, and good morning, Judge Wilson. I have the heaviest of burdens to lift, but I'll take it one at a time. Starting off with Judge Wilson's question, yes, on behalf of Mr. Williams, we deny that there was an intent or act to defraud in this case. And the reason I say that, Judge, in an analysis using the Lanham Act, which was cited in our brief, first of all, the Court has to look at the statement in question. As we cited on page 19 of the brief, we cited using the Lanham Act, but then the Alpine case from the 10th and 7th from the 2nd Circuit, and the Pizza Hut case and the Papa John's case from the 5th Circuit in 2000. The relevance of those cases, Judge, in addition to the Avis case, 1986, is you have to look at the statement in context. In other words, in analyzing the words that was advertised, it's just like the Hubble case said, you're in good hands with all states. It doesn't mean that there's a hand holding you. State farm, like a neighbor is here, doesn't mean that state farm is next door to you. The words that were used specifically on Craig's List appears on page 20 of the brief. It says, bad credit, no credit, no pay stub, no problem. Then it goes to list a car or cars that are available to you. But then most importantly, it says, our credit rental program will allow you to build or rebuild your credit. You're not being told that you're getting a car to rent to own. The rental aspect of it, Judge, is when you rent these cars, the website is clear. It's in the supplemental joint appendix, in this case. For you to even participate in the program, you have to go online. In the supplemental joint appendix, you'll see the exemptions, the disclaimers, the notices. In other words, this is not something where you run into somebody in the parking lot and then you say, come and sign this and then I'll take your money and that's it. No. What Mr. Williams did here was set up a system whereby everything had to go online. That's an excellent jury argument. Yes, Judge, but then it's also an appellate argument because I will submit to the court that the first analysis missed by the court in a motion for judgment of acquittal and the motion of judgment of acquittal at every stage of the proceeding, including the written motion as well, is that the analysis of the Lanham Act indicates that the statement in question is mere perforate. And mere perforate, Judge, doesn't rise up to the level of a statement that is the materiality that is required for something to be fraudulent. Specifically, it tells you that you have to rent. Rental is the first aspect. But then in addition to rental, it tells you in the ad itself, while driving what you like, in 6 to 12 months, you will be able to buy something you want with down payment. Anything you want with no down payment. Yes. But then, Judge, if you look at that statement, it's an invitation, just like Allstate will say, you're in good hands with Allstate. Come to us. This is telling you to rent to own. So for you to even participate in this program, Judge Duncan, you have to go online. You have to fill out the application. But of course, Enterprise didn't rent to own, and Enterprise only allowed leases of up to 30 days. That's where the problem lies, Judge Duncan. And then reading the brief of the government, I know Ms. Dale was not trial counsel in this case, and I was. And I'm familiar with the facts and circumstances of this case. If you go on the joint appendix 1 of 5, specifically, there were testimony given by Marlon Payne. It appears on my cross-examination, and even the government, on page 532. And then Mr. Cunningham, who's the prosecutor, earlier said I tried the case on page 518. On the cross-examination of Mr. Payne, Enterprise, as Mr. Payne indicates, Judge, his statements on the oath, he specifically says, we are in competition. Mr. Williams showed up with a competitor's vehicle. We then decided to get into a program with him. Enterprise, in competition, then gave him what they call a special rate for businesses. What does that do? That allows you to rent a car. As Mr. Payne, the gentleman that negotiated the deal with Mr. Williams, the preferred rate, Judge Duncan, that they have, and the agreement that they had, allowed them to rent that vehicle up to 12 months. That is what is mixed in the whole argument. Enterprise may allow you to rent for 30 days, but what Mr. Williams had with Enterprise allowed you to rent for up to 12 months. Your employees, your independent contractors. There's even further argument made by the government in its brief. And then it was even made a court that Enterprise, that after you rent with them, that Mr. Williams was pushing 2K tech. However, specifically on the joint appendix, on the testimony of Mr. Carter, who is one of the employees at Enterprise Rental. Everybody that rented at Enterprise under Mr. Carter had what? Needed a pay stub, and then needed the name of the employer. Every documentation in reference to rental by Mr. Carter of Enterprise indicates that the individual was employed someplace else, not with 2K tech. Additionally, and most importantly, Mr. Carter's statement on the cross-examination appears on 571 of the joint appendix. The only individual from Enterprise Rental that had 2K tech, I will surmise out of either laziness or for some reason, 2K tech listed as the employer is Miss Kenetia McCune. That appears on page 601 up to 622 and up to 650 of the joint appendix. Specifically with respect to Miss Kenetia McCune, on the forms that she filled out, she put in employee 2K tech. But the problem with that is, she also then has pay stub from the individual showing that this individual was employed someplace else. So there was no intent to deceive Enterprise. Enterprise knew what they got into. Enterprise was collecting the money. But I thought that Enterprise was told that you were renting company cars for your employees, or that Mr. Williams was renting a fleet of cars for his employees. No, Mr. Payne said that that conversation never even took place. That's why I directed the court to read Mr. Marlon Payne's cross-examination and that's on page 532. And I will invite you to read his direct examination as well. He's the person that negotiated. He said he had conversations with him. All they wanted, judge, was to rent cars to people to use. Cars were rented. Monies were being paid. They were not deceived. And why I submit that they were not deceived, judge, is in addition to this information from Mr. Payne. The other gentleman that appeared on behalf of Enterprise, even told the jury on the oath that the logos that were being used by Mr. Williams was without the authorization of Enterprise. However, part of the documents and record is the stipulation by the parties that it was authorized to use that logo, including Enterprise logo. CarsDirect.com. The ad speaks for itself. The website speaks for itself. The government in its brief, and as we argued before the court, everybody seems to have this notion that this is something that was happening in a parking lot and then he's hiding information from people. Every person that appeared as a renter, example, Chisa Riley. She works for IBM. She said she needed a rental car. Billy Haynes had a job. Roderick Thompson had a job. Donika Boris had a job. All the witnesses called by the government each had jobs. They've rented cars before. Remember specifically that Donika Boris was the first one that testified. My specific question is, you've bought a car before, right? Yes. When you buy a car, you go through the finance people so that you determine your monthly payments and everything else that goes with it. And she admitted. So I do not see where the government or the court could find anything other than an advertisement. Why were the cars repossessed? The cars were repossessed because what happened was, some individuals started calling Enterprise Rental. And then they wanted Enterprise Rental payments from Mr. Williams. Mr. Williams was running into problems, the problem being that part of this program requires you. Not only do you have to get this rental car at a reduced rate, because remember, he's getting it at a reduced rate, preferred rate negotiated with Enterprise. But then Mr. Williams has to come up with money to make payments. These individuals getting low rental rates, insurance included, including maintenance, are supposed to advertise and sell telephones. Advertise and sell other products on behalf of a company known as shop820more.com. But then these individuals did not follow through on part of what they were supposed to do. Some did not even make payments. So Mr. Williams ran into problems. And then when he ran into the problems, payments were not being made. Enterprise needed the money. They started repossessing the cars after calling the individuals. And how? That's how it all broke down and came apart. Thank you, counsel. Ms. Sale. Good morning. I'm Barbara Sale from the U.S. Attorney's Office for the District of Maryland. And as Mr. Iwanage noted, I was not trial counsel below, but I would be happy to try to answer any questions the court might have about the sufficiency or anything else in this case. This is one of the most cynical and pernicious fraud schemes I've ever seen, 30 years of prosecuting fraud schemes, because it targeted people who, as Mr. Iwanage said, had jobs, but they had no way to get there. The very first witness, Ms. Dominique Love, I believe her name was, was a phlebotomist. She had a lab job, but she lived in Charles County or St. Mary's County, Maryland, rural southern Maryland, which is just a wilderness of strip malls. You can't get anywhere without a car. And she had no car, no credit. How long do you suppose she was going to be able to keep that job? So the people he targeted by his ads, and I include Ms. Brown in this, were people who were desperate for one of the necessities of life. And this is the very same fraud that he had perpetrated before with the apartment scheme and the thrifty car rental scheme. And I guess... Could I interrupt? I'm really sorry. Just before I forget. Did Ms. Brown, and I will ask on rebuttal, object to the evidence of the relationship coming in? I just don't remember seeing that. I believe she did, Your Honor, and I don't have the page site, but I will certainly be happy to look it up. And I will ask. Thank you. All right. Just to speak to Ms. Brown... No, but, no, go on with the argument. I did not mean to disrupt your train. I was just checking something off. Well, I did want to focus on Ms. Brown.  And essentially, both my learned friends did that. The jury rejected those arguments. This case was fully aired and well-instructed and well-tried. And there is really nothing in this record that suggests that Your Honors ought to reverse the jury's determination in this case. This scheme is just peculiar. By placing an ad in the Pennysaver on Craigslist, and I would note that the ads were not placed in the Wall Street Journal or Town & Country. These were... Pennysaver is a circular that is sent by U.S. mail to different zip codes and neighborhoods. And they were able to choose which zip code or neighborhood the Pennysaver went to. And it's just a classified ad service. And the advertisement, as it's stated, said auto rent-to-own. It is not ambiguous. Anybody reading that is going to believe this is the answer to my problems. I can't get to work. I'm going to lose my job. I can rent-to-own a car. It said credit program, bad credit, no credit, no problem. Wide selection of cars, trucks, SUV. Low monthly payments, low down payment, insurance and maintenance included. Now you or I might look at that and think, this is ridiculous. It's too good to be true. But the people who get bamboozled in fraud schemes tend to be either the desperate or the greedy. And these people were not greedy. They were desperate. These were people who absolutely needed this necessity to get by. They responded to the ad. And the fact that in Mr. Williams' mind, they had to enter into his multi-level marketing scheme as part of the getting the car doesn't fully add up. Some of these people were taken to Enterprise the very day they called. They called. They spoke to Ms. Brown. And within 24 hours, they were in an Enterprise parking lot signing paperwork and waiting for their cars to come. The first lady who testified, I believe it was Dominique Love, only had the car for two days. Two days and the car was repossessed. I mean, and she was out $1,000 for a two-day car rental. That's just mean. That's the only way I can put it. It is just a mean scheme. And it is frankly something that Mr., as Judge Berdar found. What part was the misrepresentation, material misrepresentation of facts? The material misrepresentations were that people were ever going to be able to own the cars. You go to buy a car, to rent a car from Enterprise Car Rental, there is no possible means by which you're going to end up owning that car. It wasn't a lease program where at the end of the lease with the dealership, you have the option to buy. There was simply no potential. The other thing is, this program was economically impossible. It was, it could not succeed. And the same was true of the apartment program. The witnesses from Enterprise testified that ordinarily, the price to rent any car from Enterprise would be from $800 up to maybe $1,400 a month. This was $300 a month. $300 a month with the upfront payment to Mr. Williams. So what had to happen is a person would write their check, and one lady wrote, Ms. Cesar Riley, wrote a check for $5,000 to Ms. Brown in person. Write a check for $5,000 upfront, you get taken to the Enterprise car lot, you get a car, and you start making monthly payments of $300 a piece. Seems like a good idea, right, for the person who's getting a rental car for $300? Sounds like a great plan. But the fact is that Mr. Williams was not applying any of that upfront fee to the difference between $300 and $800. They were not paying for actual rental cars. They were paying, and the representations were, you pay us, you pay us, you don't pay Enterprise. We'll take care of this. We've got this program, we've got this government rate, or this, excuse me, this corporate rate, we'll take care of everything. And these people believed it. And why wouldn't they? They were being told. Ms. Brown was the face of the operation. She's the one that people dealt with. She answered the phone. She placed the ads. She took people physically to the car rental places, and she told them, you're dealing with us. Your deal is with us, not with Enterprise, which is another way of saying, don't bother to read that fine print. Don't bother to read that part where it says you only have the car for two to four days. You're getting a monthly rate of $300. Was that fine print there? I'm sorry? You said, don't bother with the fine print. Yes, there was fine print there. Yes, and the witnesses, some of them were cross-examined about that. They were asked, well, didn't you see that you were just signing for a car for a couple of days? And the response was, she told me your deal is with us, not with Enterprise. It's unfortunate, but as I say, these people were desperate. They lived in areas where they couldn't get to work without a car, and they didn't have cars. They needed that. Turning briefly to the 404B evidence in the case, this was not by any stretch of the imagination Mr. Williams' first brush with fraud. He had been convicted in 2005 of a virtually identical scheme in which he offered apartment rentals to people who had bad credit or no credit. And, again, the deal was with him. He sublet apartments to people, didn't pay the rent, and, of course, they got evicted just as these cars got repossessed. It was exactly the same scheme dealing with a different necessity of life. And he got convicted. He got sentenced to 10 years, five suspended, served about three and a half years. He came out of jail, and what did he do? He started doing that very scheme again. And then it morphed into what I call the thrifty car rental scheme, which was the same scheme with thrifty car rental before he got into Enterprise. And as Judge Berdar found in sentencing Mr. Williams, he is absolutely undeterrable. He is incorrigible and unrepentant. And he is one of these people who simply believes that money is better off in his pocket than in your pocket. Now, I willingly concede that Ms. Brown at the outset was a customer, a willing participant. She believed in the program. And part of Mr. Williams' shtick, if you read the whole record, is that he's got this multilevel marketing scheme in all of these different dot-com businesses. And the idea is to get people working for his telephone plan or whatever it was. Frankly, the supplemental joint appendix has some of the website stuff in there, and I frankly invite the court to read it if you want to. I didn't understand it. It is simply marketing gobbledygook in my view. However, conceding that that's part of the plan, Ms. Brown bought into that. She thought, yes, we've got a program here. We can do this. But there came a point at which she had to know that she was walking these people into a very, very bad situation. She was taking them to Enterprise. She was saying congratulations to them when they got their car. And then two, four, six days or a number of weeks later, their car was being repossessed. She knew that, and she was convicted on, I think, six counts, six substantive counts, all of which were at a point in time when she'd been doing this for a little while. And I'm willing to concede that in September of 2010, she probably didn't realize there was anything wrong with this. By October of 2010, she probably didn't realize there was anything wrong with this. By November or December or January, when she had taken any number of victims to Enterprise Rental and she had seen them lose their car, by some point she knew. And the jury appropriately found that. I think that we can assume that the jury rejected the notion that she was a conspirator, in part because they believed she wasn't in it from the beginning. And I'm fine with that. She probably wasn't in it from the beginning. But at some point, she became a willing conspirator in simply fleecing person after person after person. And that is the point at which she began to accrue convictions. Now, does the court have any other questions? There were a lot of issues here, and I have not addressed all of them. What about the sentencing aspect of the enhancement for managing five or more people? What people were managed? Judge Berdar did an excellent job with – Well, that's for us to decide. Well, you're right. It's for me to argue, though. Judge Berdar very – let me say this. He carefully and meticulously went through the guidelines and found various enhancements, and then he – Who were the five people? Let's just start with that. I do not believe that he did apply an enhancement for management of five people. That would be a – He gave him three for an aggravating role. What do you mean, aggravating role? Oh, okay. I'm sorry. Aggravating role was based upon managing five or more people. You have two versus three. He gave him three, didn't he? What he gave – let me just go through it, Judge. Maybe I'm not understanding the court. The base offense level was seven, and the loss amount was – gave it six levels. He added six for the number of victims, which is 47, and for the vulnerability of victims. That added an additional six points. Three for the aggravating role under 3B1.1b, and two for obstruction of justice. Okay. I wasn't – let's go to the aggravating role. What was that based upon? Let me see if I have it here. Managing five people or more. And I think – I don't recall, frankly, from looking at the sentencing transcript, and I'll be happy to find this and supplement my answer in a letter. Well, you don't need a 28J. That's the record, counsel. Well, I – That's not a separate – I'm sorry, Your Honor. I'm not sure I'm going to let you – excuse me. I don't have the sentencing transcript in front of me. My recollection is that he – You're not prepared to argue that, then. No, no, no. Let me finish, please. What he said was – what he did was he took the entire scheme from the beginning to the end. There are certainly two people that he managed, Ms. Brown and Ms. Candace McCullough. All right. His brother was also arguably a member of this scheme. He was part of the multilevel marketing scheme. I can't – I do not know the answer to whether there were more than those three. The record doesn't indicate that it was. And you're responsible for knowing the record. Yes, Your Honor. And that's why I said, are you not prepared to argue that? You should know the record. That's why I'm asking you. That's appeal. That's a part of the appeal. So the question is, what was the factual basis for that aggravating level? And it doesn't appear by your count, mine either, that there were more than three. And it says five. I believe – Can you concede that that was wrong? No, Your Honor, I don't. I believe that the answer that – and I would like the opportunity to check this, but I believe the answer is Judge Bernard took into consideration the entire course of conduct. I followed that, a continuum. But along that continuum, you've come up with three people. Go ahead. Continue on the continuum. I do not remember the names of those people, but he did not do it by himself. I'm sorry. I just don't know the answer to this, just technically. Is that the only basis for a finding of an aggravating role is the number of people? No, it can also be the sophistication of having a management role in an otherwise sophisticated crime. Was that given as the reason? Your Honor, I again apologize. I do not have that in front of me, and I do not remember whether the words were said in sentencing about that specific role enhancement. Did the district judge adopt the pre-sentence report? Yes, he did, and he actually went beyond that. And so there's some language in the pre-sentence report? There should be, Your Honor. I believe there is. What about vulnerable victims? He found that – yes, he did make a finding of vulnerable victims. He enhanced it by three levels for the vulnerable victims and the number of the victims. Why were they vulnerable? They were vulnerable because, as I said at the outset, they were economically vulnerable. These are people who were desperate. They needed transportation. Is that the case because you're vulnerable just because you're poor? Poor people can't be intelligent? I didn't say for a moment, nor did I mean to avoid – Well, why would they be invulnerable just because they're poor? They were vulnerable because they needed transportation. These people would lose their jobs. They are not on bus lines. Because you need a car, you're vulnerable? In this case, yes, Your Honor. I invite you to read the testimony of the victims in this case. These people needed – they were dependent on cab rides, hacks, and the kindness of friends to get them to work. How long do you suppose they would be able to keep their jobs? Once we start doing that, counsel, you make a great argument, a social argument. But the thing is that if you're going to start slicing off that, then if someone needs a suit of clothes, they're a vulnerable victim. Your Honor, I've handled countless fraud cases. Lots of the victims are not vulnerable. They're just greedy. They just want something for nothing. They just see something that they think they can have. And these are not those people. These are people who really and truly needed – one of the necessities of modern life. And he targeted those people. He didn't target middle-class people who were able to get themselves to work and, you know, get cell phones. Well, a lot of people target poor people. If that's the case, a lot of the ads – look at daytime ads, nighttime ads that talk about low credit. Is that targeting poor people? I submit that it probably is. If you're like a mortgage repair, one of these mortgage repair scams, you're targeting people who are desperate, who are going to lose their house if they don't do something. And instead of giving them some good advice or something they can use, you take more money from them. I submit that that is taking advantage of vulnerable people. None of them go to jail. Oh. You prosecute them. I'm trying.  I've gone way over my time, and I apologize. No, you haven't gone over your time because I was asking you questions. All right. Any other questions? No. Thank you. She says you're applying as the worst person she's ever seen before. You're terrible. That's the way they make it out to seem, Judge. But let me take it one at a time. In reference to the question from Judge Duncan as to whether there was an objection, yes, there was. And you can find that on the joint appendix starting at 345, and the discussion goes into 346 and 346, and then the court made a ruling in 349. And I appreciate that. And is it also an argument that you made in your brief? Absolutely. Judge, I did not make that argument because I focused. I made that objection, and then so did Misaki. But that argument was not specifically argued in our brief. Thank you very much. You're welcome, Judge Duncan. And thank you for looking that up for me. You're very much welcome, Judge. With respect to the question from Judge Wilson about the rule and the offense, whether we can find that in the present tense investigation report, the answer to that is no. Joint appendix 2113, rule and the offense, paragraph 47, adjustment for rule and the offense, none. In other words, as I stated in my brief, that even the present tense writer starts on page 57, that even the present tense writer did not even find a rule adjustment, in this case, to given the manager, organizer, or leader. So I don't know where the judge found that from. As Judge Gregory articulated, you have to have five or more people to support that position. I thought it could be a scheme that was otherwise extensive. I respectfully disagree with the court. I believe that what applies here seems to be what this court found in United Vs. Sales, whereby the appellant at most was nothing more than a manager over property and assets of his business and not over people, and that will be found in our brief on page 58. And with respect to the vulnerable victim that your Honor, Judge Gregory, brought up, what vulnerable victim? This court in the Etote case that you decided last year, E-T-O-T-I, specifically says that every fraud involves somebody vulnerable. There has to be a nexus. As this court articulated in Etote, court statute 2012, that vulnerable was clearly a runner since nothing illustrates how the victim's vulnerability made them particularly susceptible to the criminal conduct. Specifically in this case, there's no vulnerability. People looking for a car. Many people are looking for a car. They have bad credit. They want to repay their credit, but there's nothing about it that makes them susceptible. There has to be some nexus. So citing and relying on the Etote case and the Newman case that this court also relied on from the 7th Circuit. How did Mr. Williams' program help their credit? The way it's supposed to help their credit, as the lady from, what is it called, Equifax. Her name is Buffy Christie. You will find that in page 516 of the Joint Appendix. The way it's supposed to work, Judge, if only it got there before the Secret Service and everybody ran in, is once you get the car from the company and you're renting, you then go through the process of applying for the secured credit card, like Wells Fargo, just behind this courthouse. When you apply for the secured credit card, it helps you and assists you to build your credit. When you build your credit, your credit rate then increases. Once it increases, it gives you the ability to be able to own. In other words, you can go into a dealership. Now you've fixed or repaired your credit. As Judge Gregory said. You can buy anything you want. You can buy. It's like every time that they tell us that we can buy. Judge, whenever you look on those ads from Toyota or Lexus, they always tell you that 4.9% APR until you show up at the door. All those ads. Marketing is inherently deceptive. In a way, Judge, it's deceptive, but then you still have to find that material falsehood on the part of the appellant for you to Call it potpourri. I will call it potpourri. As Judge Leonard Hans quite eloquently articulated, Judge, the potpourri argument is even much better when you look at it in the totality of the circumstances of this case. All he's telling you is come in through the door. We can get you to do this. I've only practiced for a short 20 years, Judge, but I have never seen a case, even when pre-booker and post-booker, where a judge decides to go from a criminal history Category 3 to 4 based on the reasons of risk of recidivism. Then turn around again. In addition to going and doing a variance, an upward departure from criminal history 3, because you've got to remember criminal history Category 3 puts into consideration for purposes of guidelines those offenses that you said he committed in PG County. After counting it, then you double count it to get him to criminal history 4 from where he was originally. Then you add an addition to it after you've arrived at 77 to 96 months. You then move him up to 120. In other words, you do double upward departure. Judge, I've never seen that. Even in child molestation cases, even in CEE cases, even in CCE cases, I have never seen such an upward departure. That, I believe, Judge, is something that this Court has to reverse because it's inconsistent. Lastly, on the 4-4-B, Judge, this Court, I will rely on the Hernandez case. In the Hernandez case, Judge, the fact that a defender may have been involved in drug activity in the past does not in and of itself provide a sufficient nexus to the charge conduct. Anything dealing with apartment complex or PSG has nothing to do with a rent-owned business. As Judge Motz wrote in the opinion dealing with 4-4-B, it has to do with the remoteness of it. An argument to Judge Brida is it is so remote, five years past. And then in addition to being five years past, Judge, it is unrelated to the charge conduct. And I didn't have time to bring to the attention of the Court by way of writing a decision that came out August the 6th from the 10th circuit that I cited for the purposes of the record, United States v. Smith, where the case was reversed on a 4-4-B. And in that particular case, Judge, it's a case where it's a two-year-old drug deal in another case. So based on those reasons and any other reasons that may appear to the Court, I submit to your honor that this case requires a reversal. It's Mayor Palfrey, the writer, as Judge Lennonhan says and specifically states, is held to what they've signed and what they've written. They read it, they signed onto the program, they are bound by it. Based on those reasons and any other reasons that may appear to the Court, I ask that this case be overturned and remanded for further proceedings consistent with this Court's ruling and that the sentence in this case be vacated because it's an unreasonable sentence based on the facts of the case. Thank you for your time and attention. Thank you. Mr. DeWange and Saki, I know that you're both Court opponents. Again, we especially thank you on behalf of the Court for taking this assignment. It's tough cases and we couldn't do our work without it, and we really appreciate it. We thank you. You're very much welcome. If I may tell you what would surprise you, I actually did this two-week trial pro bono. Thank you even more so. We appreciate that. Ms. Sales, thank you for your zealous and able representation of the United States. We're going to ask the Clerk to adjourn the Court sine die and then we're going to come down to Greek Council. Thank you.
judges: Roger L. Gregory, Allyson K. Duncan, Samuel G. Wilson